**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**www.flsb.uscourts.gov**

| | | |
|---|---|---|
| In re: | § | (Chapter 11) |
| | § | |
| ARROW AIR, INC. AND | § | Case number 10-28831-AJC |
| ARROW AIR HOLDINGS CORP. | § | Case number 10-28834-LMI |
| | § | |
| | § | |
| Debtors. | § | (Joint Administration Requested) |

**AFFIDAVIT OF DOUG YAKOLA**
**IN SUPPORT OF FIRST DAY PLEADINGS**

| | |
|---|---|
| STATE OF FLORIDA | § |
| | § |
| COUNTY OF MIAMI DADE | § |

BEFORE ME, the undersigned authority, personally appeared Doug Yakola, who, upon being duly sworn, deposed and stated as follows:

My name is Doug Yakola. I am over the age of eighteen and am fully competent to testify. I am Chief Restructuring Officer of Arrow Air, Inc. ("Arrow") and Arrow Air Holdings Corp. ("Holdings") (collectively, the "Debtors"). I am familiar with the Debtors' operations, financings and efforts to reach an agreement with strategic investors, financing parties and purchasers. I have personal knowledge of the facts set forth herein.

## I.    Factual Background

1.    On June 30, 2010, (the "Petition Date") the Debtors filed voluntary petitions under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The petitions were filed with the authority of each Debtor's Board of Directors.

2.    The Debtors continue to operate their business and manage their assets as debtors in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

835429_15.DOC

A.      **Corporate Structure of the Debtors**

3.      Holdings is a Delaware corporation with its principal place of business in Miami, Florida.  MP Arrow III, LLC ("MP III"), an affiliate of MatlinPatterson Global Opportunities Partners III ("MatlinPatterson"), owns a 95% equity interest in Holdings.  James J. Pinto, Michael T. Tokarz, and Phillip T. George (collectively, the "Minority Shareholders") each own a 1.67% equity interest in Holdings.

4.      Arrow is a Florida corporation with its principal place of business in Miami, Florida.  Arrow, a wholly owned subsidiary of Holdings, provided scheduled and charter cargo logistics services between the United States, Central and South America, and the Caribbean. Arrow does business under the name Arrow Cargo.

5.      Castillo de Alcala, S.A. ("Castillo") is a Costa Rican company that is also a wholly owned subsidiary of Holdings.  Castillo employs Arrow's Costa Rican station staff. Castillo invoices Arrow Air, Inc.'s Costa Rican branch for the cost of the payroll.

6.      Agro Air Associates, Inc. S.A. ("Agro") is an inactive Costa Rican company that is a wholly owned subsidiary of Arrow.

B.      **Business of the Debtors**

7.      Arrow is a U.S. registered, Miami-based air cargo carrier that provided comprehensive cargo logistics services between the United States, Central and South America, and the Caribbean.  Arrow did business under the name Arrow Cargo.

8.      Prior to the Petition Date, Arrow had approximately 540 employees located in Miami and throughout Central and South America of which approximately 80 were active and inactive crew members.  Arrow is a party to a collective bargaining agreement with the

International Brotherhood of Teamsters, Airline Division (the "Union").  The Union represents the interests of the cockpit crew members.

9.      Founded in 1950, Arrow was the largest single cargo carrier operating out of Miami International Airport in 2009.[1]  Prior to the Petition Date, Arrow operated a fleet of wide-body DC-10 and narrow-body 757 cargo aircraft.  Arrow maintains a large cooler and storage facility in Miami that gives Arrow an advantage over its competitors in the U.S. perishable import market.

10.     With over 60 flights each week to 20 destinations, Arrow has more than 3,500 customers worldwide.  Arrow's customers include international and domestic freight forwarders, integrated carriers, passenger and cargo airlines, the U.S. Department of Defense and the United States Postal Service.

**C.      Assets and Liabilities of Debtors**

     **1.      <u>Loan Obligations</u>**

11.     The Debtors have indebtedness of approximately $72 million made up by two term loans with MP III and a term loan with MP Arrow Leasing Ltd.  Arrow is the borrower under that certain Second Amended and Restated Credit Agreement (including all prior and subsequent amendments, the "Credit Facility") entered into as of May 5, 2009 between MP III, as Lender, Arrow, as Borrower, and Holdings, as Guarantor.  The Credit Facility has been amended from time to time to increase Arrow's borrowing ability.

12.     Under the Credit Facility, the Debtors are indebted to MP III on a secured term loan (the "Secured Term Loan") with an outstanding principal and an accrued interest balance of $58,529,302.39 as of March 31, 2010 and an unsecured term loan (the "Unsecured Term Loan," and together with the Secured Term Loan, the "Term Loans") with an outstanding principal and

---

[1] In the calendar year 2009, Arrow carried 203,965 short tons of freight.

accrued interest balance of $7,833,988.67 as of March 31, 2010.  The Secured Term Loan is secured by all or substantially all of the Debtors' assets pursuant to that certain Amended and Restated Security Agreement dated as of May 5, 2009 by and between Arrow and Holdings, as Grantors, and MP III, as Lender.  The Term Loans bear interest at 2.04% per annum.  The Term Loans mature on May 4, 2013.  The Term Loans are guaranteed by Holdings pursuant to that certain General Continuing Guaranty dated as of January 30, 2009.

13.    The Credit Facility was amended numerous times and was last amended, on June 18, 2010, in that certain Eighth Amendment and Forbearance to the Second Amended and Restated Credit Agreement (the "Eight Amendment") among the Debtors and MP III.  Under the Eighth Amendment, MP III agreed to forbear from exercising its rights and remedies under the loan and security documents evidencing the Credit Facility and Arrow established a segregated deposit account at Regions Bank with approximately $4 million of MP III's cash collateral.  MP III maintained control over the Regions account pursuant to a notice of control delivered to the bank.  Prior to the Petition Date, MP III swept the Regions account in consideration for, and as a condition to, reaching a cash collateral agreement for the Debtors' bankruptcy case.

**2.    Aircraft Leases**

14.    Prior to the Petition Date, Arrow operated a fleet of four DC-10-30 and three B-757-200 aircraft.  In addition, Arrow from time to time entered into wet leases of aircraft as required to meet operational demands.

**a.    The DC-10s**

15.    Arrow leases four DC-10-30 airframes, tail numbers N490ML, N524MD, N478CT, and N526MD, pursuant to those certain Amended and Restated Aircraft Lease

Agreements (as amended, the "DC-10 Leases"), by and between Miami Leasing, Inc. ("Miami Leasing"), as Lessor, and Arrow, as Lessee.

16.    The DC-10 Leases only cover airframes and do not include engines.  Arrow leases 12 CF6-50C2 engines for the DC-10-30 aircraft from various engine lessors.

17.    In that certain Waiver and Forbearance Agreement dated as of May 26, 2010, Miami Leasing agreed to forbear through July 10, 2010 (the "Forbearance Period") from taking any enforcement action or exercising any related rights or remedies against Arrow or the airframes under the DC-10 Leases due to any defaults that might have existed as of May 26, 2010 or that might occur during the Forbearance Period.

**b.    The 757s**

18.    Arrow leases three B-757-200 aircraft, tail numbers N688GX, N689GX, and N822PB, and six Rolls Royce engines pursuant to lease agreements by and between Wells Fargo Bank Northwest, N.A., as Owner Trustee, and Arrow, as Lessee, as follows (collectively, as amended, the "757 Leases"):

a)    Amended and Restated Lease Agreement MSN22688, dated as of March 11, 2009;

b)    Amended and Restated Lease Agreement MSN23822, dated as of May 18, 2009; and

c)    Amended and Restated Lease Agreement MSN22689, dated as of July 17, 2009.

19.    MP Arrow Leasing Ltd., an affiliate of MatlinPatterson, is the beneficiary of the 757 Leases.  Arrow failed to make substantially all of the rent payments under the 757 Leases. In June and July of 2009, Arrow requested, and the Owner Trustee under the 757 Leases agreed, to defer Arrow's obligation to pay rent under the 757 Leases that became due and payable from June 1, 2009 through September 30, 2009.  Arrow further requested, and the Owner Trustee

agreed on October 1, 2009, to extend the deferral of payment of rent for the period through December 31, 2009.  Subsequently, by that certain Omnibus Amendment No. 2 to 757 Lease Agreements entered into as of January 25, 2010 among the Owner Trustee and Arrow, the rent payments that had been deferred under the 757 Leases were memorialized by the  execution of a promissory note in the amount of $6,514,321.36 to be paid by Arrow to MP Arrow Leasing Ltd. The promissory note matures on May 4, 2013.

20.     In addition to the 757 Leases, Arrow leases a spare RB211 engine the "Spare Engine Lease") from RRFP Engine Leasing Limited Rolls Royce and Rolls-Royce & Partners Finance Limited.  MP Arrow Leasing Ltd. is a guarantor under the Spare Engine Lease.

**3.     Facility Leases**

21.     The Debtors lease two buildings at Miami International Airport and corporate office space near the Miami International Airport for its finance department pursuant to the following lease agreements:

   a)  Facility Sublease Agreement, dated as of November 1, 1999, by and between Airis Miami II., LLC, as Landlord, and Arrow, as Tenant, (as amended, the "Building 711 Lease"). The Building 711 Lease was assigned by Airis Miami II, LLC to Aero Miami II, LLC by that certain Bill of Sale, General Assignment and Assumption dated as of April 29, 2005.

   b)  On Airport Net Lease, dated as of December 31, 2004, by and between AMB Codina MIA Cargo Center, LLC, as Landlord, and Arrow, as Tenant (as amended, the "Building 712 Lease"); and

   c)  Office Lease Agreement, by and between Hines REIT Corporate Center, LLC, as Landlord, and Arrow, as Tenant (as amended, the "Corporate Office Lease").

**4.    Parts and Equipment**

22.    Arrow has spare parts inventory in addition to other general equipment and parts its owns.  Arrow's parts and equipment had a book value of $8.7 million as of May 30, 2010.

**5.    Accounts Receivable**

23.    As a result of its business operations prior to the Petition Date, Arrow has substantial accounts receivable.  Arrow's accounts receivable had a book value of $24.3 million as of May 31, 2010.

**D.    Prior Chapter 11 Filings**

24.    Arrow filed for bankruptcy relief twice prior to this case.

25.    Arrow first filed for relief under chapter 11 of the Bankruptcy Code on September 27, 2000 in the Southern District of Florida along with several affiliates in a jointly administered bankruptcy case, *In re Fine Air Services Corp., et al.*, case number 00-18671-AJC (the "First Case").  Arrow and its affiliates emerged from the First Case in May 2002 through a confirmed plan of reorganization.  Effective May 8, 2002, pursuant to the confirmed plan, Arrow became a wholly owned subsidiary of Holdings.

26.    Subsequently, on January 28, 2004, Arrow and Holdings, along with three other wholly-owned subsidiaries of Holdings, filed for relief under chapter 11 of the Bankruptcy Code in the Southern District of Florida in a jointly administered bankruptcy case, *In re Arrow Air Holdings Corp., et al.*, case number 04-10727-AJC  (the "Second Case").  Arrow and Holdings emerged from the Second Case on June 10, 2004 through a confirmed plan of reorganization.  A final decree was entered in the Second Case on December 2, 2006.   Under the plan of reorganization in the Second Case, Arrow Air II, LLC ("AAII") acquired Holdings.  AAII was owned by Pinto, George and Tokarz.  In turn, Holdings owned 100% of Arrow.

E.        **Recent Restructuring Efforts**

27.        Over the two and half years prior to the Petition Date, MP III invested over $100

million into the Debtors in an effort to restructure and reorganize the Debtors' operations.

28.        Prior to MP III's ownership in Arrow, on January 25, 2008, an affiliate of MP III

extended a revolving line of credit to Arrow in an amount up to $4 million available to Arrow

under the Credit Facility.

29.        On February 22, 2008, MP III entered into a Stock Purchase Agreement with the

then-equity owners of Holdings to purchase 85% of the equity interests in Holdings, thereby

leaving AAII with only a 15% ownership interest in Holdings.  The stock purchase also served to

restructure certain debt obligations of the Debtors.  The closing of the stock purchase occurred

on June 26, 2008.  At the closing, MP III invested $30 million as a capital contribution to the

equity of Holdings. In addition, at the time of the closing of the stock purchase, the Credit

Facility had been expanded and over $18 million of borrowings under the Credit Facility were

outstanding.

30.        MP III continued to invest in and loan money to Holdings and Arrow over the

course of the calendar years 2008 and 2009.  In August of 2008, MP III invested an additional

$8.5 million into the equity of Holdings.

31.        In December 2008, a comprehensive review of Arrow's business and operating

plan was undertaken.  The review identified several issues that needed to be corrected in the

coming months, including improving the timeliness and accuracy of its financial statements,

reducing operating costs, improving operational reliability and successfully completing the 757

aircraft induction into the fleet.  Based on that review and notwithstanding the significant

investments already made, in February 2009, MP III invested an additional $20 million in

working capital in Arrow pursuant to the Credit Facility in order to fund Arrow's operational needs.

32.     In February 2009, during a scheduled heavy maintenance check, Arrow discovered that its leased DC-10-10 aircraft had sustained corrosion in an area that made the aircraft inoperable unless repairs well exceeding the aircraft's value were undertaken.  The lessor of the DC-10-10, Miami Leasing, took the position that the lease agreement provided that Arrow was responsible for repair of the aircraft regardless of the cost.  The dispute, together with other issues that had arisen on the other DC-10 Leases,  threatened Arrow's financial and operational viability.  In addition, Arrow's Minority Shareholders (some of whom are also owners of Miami Leasing) alleged various claims against Arrow.

33.     In that certain Settlement Agreement and Mutual Release entered into as of  May 5, 2009 (the "Global Settlement Agreement"), Arrow structured a global settlement to resolve outstanding disputes with Miami Leasing and its Minority Shareholders.  The Global Settlement Agreement provided, among other things, that Arrow's liability for the corroded DC-10-10 be released, the lease payments under the remaining DC-10 Leases be reduced, and other outstanding claims by both Miami Leasing and the Minority Shareholders be resolved.

34.     As part of the Global Settlement Agreement, MP III invested an additional $5 million that was used by MP III and Arrow to pay the Minority Shareholders and Miami Leasing.  As a result, MP III received an additional 10% ownership interest in Holdings, thereby bringing MP III's total ownership interest to 95%, and the Minority Shareholders each retained a 1.67% ownership interest in Holdings.

35.     During the first and second quarters of 2009, Arrow continued to work on the weaknesses identified in the business.  In addition to the Global Settlement Agreement that

restructured Arrow's DC-10 Leases, Arrow was successful in putting 757 aircraft on its operating certificate, generating more fulsome financial statements, and working to improve overall reliability of the DC-10 fleet.  These successes were significant steps toward progress; however, Arrow's efforts were ongoing and far from complete.

36.    In the summer of 2009, Arrow experienced further financial difficulties. Historically, summer months are less profitable in the South American air cargo market due to a decrease in volumes of perishable goods imported to the United States.  This decrease is somewhat offset by an increase in exports; however, the continued economic recession at the time resulted in decreases in imports and export traffic much greater than anticipated.  This reduction was experienced globally by the entire air cargo industry.  Although Arrow managed to maintain its market share as compared to its competitors, maintaining market share came at the cost of further lowering rates to match competitor's offers.  Subsequently, the revenue Arrow received in the summer months of 2009 was insufficient to meet Arrow's operating expenses. Consequently, Arrow burned through much of its new working capital.

37.    During June through August of 2009, Arrow requested, and MP III granted, additional loans under the Credit Facility as follows: (i) $4.25 million to fund a new advance fuel purchase program, and (ii) $10.2 million to fund working capital to continue operations into the fourth quarter of 2009.  In addition, Arrow requested and received approval to defer payment of 757 aircraft rent and reserves in order to further conserve its cash balance.

38.    Given the heavy losses sustained in the summer of 2009, Arrow, along with the consulting firm McKinsey & Company ("McKinsey"), undertook a comprehensive analysis of Arrow's flight by flight profitability in an effort to make better decisions on routes and flight operations, as well as better forecast future revenue trends.  Based on this analysis, Arrow

implemented several adjustments to its flight schedule that began to stem the losses from the summer and set up a forecast to breakeven in the final four months of the year. However, given the higher level of operations needed in the fourth quarter high season, Arrow again needed additional working capital.

39.    Consequently, in October 2009, Arrow requested from MP III additional borrowing of $13.5 million for working capital needed to continue operations through the end of 2009 and an additional $7.5 million line of credit to fund its business plan in 2010. MP III agreed to provide most of the requested $13.5 million for working capital by funding an additional $13.1 million on November 4, 2009 under the Credit Facility, thereby bringing the Secured Term Loan under the Credit Facility to $57,747,669.04. MP III, however, did not approve Arrow's requested borrowings for 2010 until a review of potential strategic options were undertaken that might change Arrow's strategic position in the market place. Specifically, these options included a merger with or acquisition by a strategic partner.

40.    Arrow began to see some success in the fourth quarter from the changes it had put in place, as well as the start of the global economic recovery, marked by it's first profitable month in over a year during this time. Notwithstanding this success, the beginning of the economic recovery also resulted in a steady increase in the futures price of jet fuel. The jet fuel price rose from $2.08 per gallon in December 2009 to more than $2.46 per gallon by April 2010, an 18% increase that increased Arrow's operating cost by $1.5 million a month. To counter this, Arrow raised prices in the first and second quarters of 2010; however, the market would not bear the entire increase to the cost of shipping cargo, and again, Arrow began to generate operating losses and burn working capital.

41.     In January 2010, Arrow requested and received $7.8 million of funding from MP III under the Unsecured Term Loan, as well as a continued deferral of 757 rent and reserve payments.  Merger and acquisition discussions also began in earnest with several strategic partners.  These efforts continued through February 2010, with Arrow and MP III having discussions and negotiations with five potential aviation related strategic partners.  Preliminary term sheets were negotiated with at least two of these strategic partners, however, Arrow was unable to negotiate final term sheets and definitive documentation concerning merger and/or acquisition terms with these potential strategic partners.

42.     In March 2010, given the operating losses driven by higher jet fuel price, Arrow projected that it may need additional funding to operate through the typical lower summer months.  Based on this projection,  Arrow increased its cash conservation efforts and sought additional funding from both MP III and the Minority Shareholders.  Both declined to provide additional funding to Arrow.  Next, Arrow sought funding through other financing alternatives; but with no unencumbered assets to pledge, it was unable to secure additional funding.  In a further impact to its liquidity, GSB & Associates ("GSB"),  the buyer that was purchasing fuel in advance on behalf of Arrow for Arrow's operations, was unable to deliver on the month's supply of fuel valued at approximately $3.5 million that Arrow had already purchased from GSB.  Arrow was forced to buy more expensive fuel on the spot market a second time, costing Arrow more than the $3.5 million Arrow had already spent, and more importantly, diminishing Arrow's liquidity.  Despite ongoing business and legal efforts to recover this money and the fuel from GSB, GSB has failed to deliver the fuel or refund the money Arrow paid to GSB.

43.     Given Arrow's continued operating losses, Arrow and MP III expanded their efforts to contact financial investors and potential purchasers for Arrow.  A data room was

established with relevant information and efforts were undertaken to contact customers, investors, lessors, strategic buyers or partners known to invest in aviation related ventures and anyone that had investments in aviation ventures that might have an interest.   In addition, the prior potential merger and acquisition strategic partners were contacted again to determine whether they had any renewed interest.  To assist in these efforts, Arrow enlisted the services of Seabury Advisors, LLC ("Seabury").   Seabury also contacted numerous parties that could potentially have an interest in purchasing the Debtors' business.  In addition to the former potential strategic partners, Arrow and Seabury's efforts resulted in substantial discussions with at least fifteen other potential purchasers through June 2010.  These discussions resulted in the negotiation of six letters of intent.  The majority of potential purchasers providing letters of intent either did not offer sufficient consideration or were unable to obtain financing to consummate a sale.  Ultimately, definitive documentation was negotiated and drafted for two separate purchasers, one of which failed to close due to lack of financing on the day of closing. The other potential purchaser failed to close due to failure to reach agreement with the Debtors' aircraft lessors.  The sale efforts continued in earnest up until a few days prior to Arrow ceasing its scheduled service operations with no viable purchaser or transaction available to close.

44.     In summary, the potential sale of Arrow was unsuccessful for, among other reasons, the inability to obtain financing, insufficient funding by potential purchasers, and/or inability of potential purchasers to reach an agreement with Arrow's aircraft lessors or other aircraft providers.

45.     After exhausting all viable potential purchasers and investors, the Debtors made the difficult decision to cease scheduled service operations in order to preserve the existing value of their estates and to minimize any continued deterioration of the Debtors' working capital

assets.  Accordingly, on June 29, 2010, the Debtors shut down all scheduled service operations and ceased flying.  On the same date, substantially all employees were let go, except for a small "stay team" to manage the wind down and liquidation of the Debtors' estates.  In addition, all of the Debtors' aircraft were parked.  After the shut down, the Debtors determined to seek relief under chapter 11 of the Bankruptcy Code.  Although scheduled service flying has ceased, the Debtors are maintaining the airline operating authorities and the potential for undertaking charter flying in the event a transaction with a potential purchaser can be consummated in chapter 11.

46.    As part of the bankruptcy filing and shutdown of scheduled service operations, the Debtors negotiated with MP III, their primary secured lender, for the use of MP III's cash collateral to fund payments to employees, fund employee benefits, and fund the Debtors' chapter 11 cases.

47.    Specifically, prior to filing their chapter 11 cases, all employees were paid current through the Petition Date to make sure payment of existing employee wages were not delayed due to the bankruptcy filing.  In addition, the Debtors' health insurance plan was prefunded prior to the Petition Date for a full 60 days.  Accordingly, all employees who were currently enrolled in the Debtors' health care plan will have health insurance fully paid on their behalf until August 31, 2010.

48.    The Debtors intend to implement the orderly wind down of their scheduled service operations and the liquidation of their assets in chapter 11 through the confirmation of a plan subject to the availability of charter flying and any potential sale transaction that may arise in chapter 11 that can be implemented pursuant to the plan.  The Debtors intend to file a plan relatively soon after the commencement of their chapter 11 cases.

## II.    Necessity for Emergency Hearings on "First Day" Motions

49.    Contemporaneously herewith, the Debtors have filed the following "first day" motions (the "First Day Motions"):

a) Debtor's Emergency Ex Parte Motion for Joint Administration filed by Arrow;

b) Debtor's Emergency Ex Parte Motion for Joint Administration filed by Holdings;

c) Debtors' Emergency Motion for Entry of an Order Establishing a Bar Date for Filing Proofs of Claim and Proofs of Interest;

d) Debtors' Application for Interim Order Approving the Retention of Haynes and Boone, LLP as Counsel to the Debtors *Nunc Pro Tunc* to the Petition Date and for Entry of a Final Order in Accordance with Fed. R. Bankr. P. 6003;

e) Debtors' Application for Approval, on an Interim and Final Basis, of Employment of Berger Singerman, P.A. as Co-Counsel for the Debtors In Possession *Nunc Pro Tunc* to the Petition Date;

f) Debtors' Emergency Motion for Entry of an Administrative Order Under 11 U.S.C. §§ 105(a) and 331 Establishing Procedure for Monthly and Interim Compensation and Reimbursement of Expenses for Professionals;

g) Debtors' Emergency Motion For Interim and Final Orders Authorizing the Use of Cash Collateral Pursuant to 11 U.S.C. § 363(c) and Fed. R. Bankr. P. 4001(b);

h) Debtors' Emergency Motion for Order Authorizing Continued Use of Existing Business Forms and Records and Authorizing Maintenance of Existing Corporate Bank Accounts and Cash Management System;

i) Debtors' Emergency Motion for Approval of Stipulation Under 11 U.S.C. § 1110(b) with Wells Fargo Bank Northwest, N.A.;

j) Debtors' Emergency Motion Under Bankruptcy Code Section 365 for Authority to Reject Certain Aircraft and Engine Leases;

k) Debtors' Emergency Motion under Bankruptcy Code Section 365 for Authority to Reject Certain Executory Contracts and Unexpired Leases;

l) Motion to Appear Pro Hac Vice filed by Kenric D. Kattner;

m) Motion to Appear Pro Hac Vice filed by Blaine F. Bates;

n) Motion to Appear Pro Hac Vice filed by Doug H. Edwards;

o) Motion to Appear Pro Hac Vice filed by Kourtney P. Lyda; and

p) Motion to Appear Pro Hac Vice filed by Kelli M. Stephenson.

### III.    Service of First Day Motions

50.    All motions presented to the Court for consideration as First Day Motions were served in accordance with the Certificate of Notice Concerning First Day Pleadings filed contemporaneously herewith.

### IV.    Procedural Motions

#### A.    Joint Administration

51.    The Debtors seek an order directing the joint administration of the Debtors' chapter 11 cases for procedural purposes only, including the joint filing of any disclosure statements and plans of reorganization and other contested matters, pursuant to Federal Rule of Bankruptcy Procedure 1015(b).

52.    The Debtors specifically request that the cases be jointly administered under the lowest case number of Arrow in accordance with Local Bankruptcy Rule 1015-1(D).

53.    The Debtors are "affiliates" as I understand that term is defined in section 101(2) of the Bankruptcy Code because Holdings owns Arrow.  The issues that will be addressed in these bankruptcy cases will be related and overlapping.  Accordingly, joint administration of the Debtors' cases will obviate the need for duplicative notices, motions, applications, hearings and orders, and will therefore save considerable time and expense for the Debtors and their estates.

54.    The rights of the respective creditors of the Debtors will not be adversely affected by the proposed joint administration because the Debtors will continue as separate and distinct legal entities and will continue to maintain separate books and records.  Moreover, each creditor may still file its proof of claim against a particular estate.  In fact, the rights of all creditors will

16

be enhanced by the reduction in costs resulting from joint administration.  The Court also will be relieved of the burden of scheduling duplicative hearings, entering duplicative orders, and maintaining redundant files.  Finally, supervision of the administrative aspects of these chapter 11 cases by the Office of the United States Trustee will be simplified.

55.     The interests of the Debtors, their estates, and all parties-in-interest would best be served by joint administration of these bankruptcy cases.

**B.     Establishment of Bar Dates**

56.     The Debtors have requested that the Court establish certain bar dates for filing proofs of claim and proofs of interest.  The Debtors have requested that August 20, 2010 be established as the general bar date for filing proofs of claim and proofs of interest.  In addition, the Debtors have requested that the Court approve certain procedures for filing proofs of claim and proofs of interest as well as the procedures for the Debtors to follow in providing notice of the bar dates and publishing notice of the bar dates.  Setting the bar dates now and establishing the procedures for filing proofs of claim and proofs of interest and the procedures for providing notice thereof will facilitate the Debtors' efforts in identifying claims and formulating a plan for the liquidation of the Debtors' assets and wind down of operations.

## V.    Employment and Payment of Professionals

57.    The Debtors seek orders authorizing the employment of Haynes and Boone, LLP ("Haynes and Boone"), Berger Singerman, P.A. ("Berger Singerman"), and Seabury Advisors, LLC ("Seabury").

### A.    Haynes and Boone, LLP

58.    The Debtors seek to employ and retain the law firm of Haynes and Boone as attorneys for the Debtors, effective as of the Petition Date.

59.    The Debtors have selected Haynes and Boone as their lead bankruptcy attorneys because of the firm's extensive experience with business reorganizations and in particular, its experience airline bankruptcies.  Haynes and Boone has extensive experience and knowledge in the field of debtors' and creditors' rights and representing business debtors in reorganizations under chapter 11 of the Bankruptcy Code.  Haynes and Boone has expended significant resources for more than a year working with the Debtors to restructure their businesses and, ultimately, to prepare for this bankruptcy filing.  In the process, Haynes and Boone has become extremely familiar with the Debtors' business operations and legal obligations to various creditors constituencies.  Haynes and Boone has participated in the negotiations with the Debtors' creditor constituencies and is familiar with the restructuring terms under negotiation and to which certain creditors have agreed.  If the Debtors are required to retain counsel other than Haynes and Boone, the Debtors would incur additional expenses and delays associated with familiarizing new counsel with the intricacies of the Debtors' financial affairs and business operations.

## B.    Berger Singerman

60.    The Debtors seek to employ and retain the Miami law firm of Berger Singerman as co-counsel for the Debtors, effective as of the Petition Date.

61.    The Debtors believe that the attorneys of Berger Singerman are experienced bankruptcy counsel familiar with the local practices in this Court and are qualified to advise the Debtors on local procedures, as well as the more substantive aspects of bankruptcy law.  Berger Singerman has counseled and assisted the Debtors in connection with preparations for this bankruptcy filing.  In the process, Berger Singerman has become familiar with the Debtors' business operations and financial affairs and some of the legal issues that will likely arise in the context of these chapter 11 cases.  The retention of Berger Singerman will facilitate the orderly management of these cases.

## C.    Seabury

62.    The Debtors seek to employ and retain Seabury as financial advisors for the Debtors, effective as of the Petition Date.

63.    The Debtors seek to retain Seabury as their financial advisors because, among other things, Seabury and its senior professionals have an excellent reputation for providing high quality financial advice to debtors and creditors in bankruptcy reorganizations and other debt restructures, and Seabury has knowledge of the Debtors' financial and business operations. Specifically, prior to the commencement of these chapter 11 cases, the Debtors retained the services of Seabury as financial advisor on April 15, 2010.  As a result, Seabury has acquired extensive knowledge of the Debtors and their businesses and is uniquely familiar with the Debtors' financial affairs, debt structure, operations and related matters.  Likewise, in providing prepetition services to the Debtors, Seabury's professionals have worked closely with the

Debtors' management and other professionals.  Moreover,  Seabury has been closely involved in the efforts to identify potential purchasers and investors and to negotiate an acquisition or financing arrangement with them.  Prior to the Petition Date, Seabury has played an integral role in preparing for the commencement of these cases.  Accordingly, Seabury has developed significant relevant experience and expertise regarding the Debtors that will assist it in providing effective and efficient services in these cases.

64.    In addition to Seabury's understanding of the Debtors' financial history and business operations, Seabury and its senior professionals have extensive experience in the reorganization and restructuring of troubled companies, both out-of-court and in chapter 11 proceedings.  The professionals of Seabury also have significant restructuring experience in the aviation industry.

**D.    Procedures for Compensation of Professionals**

65.    The Debtors have requested that the Court enter an order establishing a procedure for compensating and reimbursing professionals on a monthly basis, comparable to those established in other complex chapter 11 cases.  The requested monthly compensation procedure would require all professionals retained with Court approval in the Debtors' chapter 11 cases to present to counsel for the Debtors, counsel for the Official Committee of Unsecured Creditors (the "Committee"),  the U.S. Trustee, and counsel for any Debtor in Possession lender, a detailed statement of services rendered and expenses incurred for the prior month.  If no timely objection is filed, the Debtors would promptly pay 80% of the amount of fees incurred for the month, with a 20% holdback, and 100% of out-of-pocket expenses for the month.  These payments would be subject to the Court's subsequent approval as part of the normal interim fee application process (approximately every 120 days).

20

66.     It is in the best interest of these estates for the Court to establish at an early date a uniform procedure for the consideration of interim applications for compensation of professionals whose employment must be approved by the Bankruptcy Court and who are entitled to be paid by the Debtors.  This will enable the Debtors to more effectively monitor the fees incurred and time their payments of professional fees more regularly.

### VI.     Motions Related to Debtors' Business Operations

### A.     Use of Cash Collateral and Postpetition Financing

67.     In the Debtors' Emergency Motion For Interim and Final Orders Authorizing the Use of Cash Collateral Pursuant to 11 U.S.C. § 363(c) and Fed. R. Bankr. P. 4001(b) (the "Cash Collateral Motion"), the Debtors request interim and final approval of use of cash collateral.

68.     The Debtors require the immediate use of cash collateral to effectuate the wind down of their business operations and assets, including the return of aircraft and related equipment and the payment of employee wages and reimbursable expenses, and to fund the chapter 11 process.  The Debtors do not have sufficient unencumbered assets (including cash) to fund these items for 14 days (or more) during bankruptcy until a final hearing on the Motion can be held.  Without the use of cash collateral, the Debtors cannot meet their ongoing postpetition obligations, including employee payroll, bankruptcy costs (including the payment of legal counsel and other professionals), and other costs and expenses related to the orderly wind down.  The inability to timely pay these costs and expenses would be detrimental to the Debtors' wind down efforts.

69.     The Debtors have attached an interim budget (the "Interim Budget") to the Cash Collateral Motion that itemizes the sources and uses of cash and provides a reasonable projection of cash receipts and expenditures.  The Interim Budget includes a list of business expenses that

21

are reasonable and necessary and that must be paid pending a final hearing.  The temporary use of cash collateral as reflected in the Interim Budget is essential to avoid immediate and irreparable harm to the Debtors' bankruptcy estates.

70.    The immediate temporary approval of the use of the cash collateral proposed is consistent with the requirements for maintaining both the value of the Debtors' assets and the cash collateral as well and to enhance the Debtors' ability to confirm a chapter 11 plan.

71.    MP III has consented to the Debtors' use of its cash collateral pursuant to the Interim Budget and the terms and conditions of the proposed interim order.  The relief requested is in the best interests of the Debtors' bankruptcy estates and their creditors, including MP III.

72.    As adequate protection to MP III, the Debtors propose to provide replacement liens and superpriority claims to MP III as adequate protection for the use of its cash collateral as more fully described in the Cash Collateral Motion.  The replacement liens are subject and subordinate to a valid and perfected lien and security interest existing as of the Petition Date. The Debtors will also furnish MP III with the budget reconciliation reports as additional adequate protection.  Based on the agreement of the Debtors and MP III, the proposed adequate protection is sufficient to protect MP III's interests in the Prepetition Collateral.

**B.    Cash Management**

73.    I understand that the Office of the United States Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of chapter 11 cases.  These guidelines require chapter 11 debtors to, among other things, close all existing bank accounts and open new debtor-in-possession ("DIP") bank accounts, establish one DIP account for all estate monies required for the payment of taxes (including payroll taxes), maintain a separate DIP account for cash collateral, and obtain checks for all DIP accounts that

bear the designation, "debtor-in-possession," the bankruptcy case number, and the type of account.  These requirements are designed to provide a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent the inadvertent postpetition payment of prepetition claims.  The Debtors seek a waiver of these requirements.

74.    The Debtors seek a waiver of the requirement that they open a new set of books and records as of the Petition Date because the Debtors respectfully submit that opening a new set of books and records would create unnecessary administrative burdens and would cause unnecessary expense, utilization of resources, and delay.  With the use of computer technology, it is now easy to differentiate between pre and post petition transactions by date.  In the ordinary course of their businesses, the Debtors use many checks, invoices, stationery, and other business forms.  A substantial amount of time and expense would be required in order to print new checks and other business forms.  Fulfillment of the requirement would likely delay payment of post-petition claims and negatively affect an orderly liquidation.

75.    The Debtors request authority to maintain their existing bank accounts (each a "Bank Account" or "Account" and collectively, the "Bank Accounts" or "Accounts") and cash management systems (each a "Cash Management System" and collectively, the "Cash Management Systems") in accordance with their usual and customary practices to ensure a smooth transition into chapter 11 with minimal disruption to operations.

76.    The Debtors also request authority to close any of the Bank Accounts if, in the exercise of their business judgment, the Debtors determine that such action is in the best interest of their estates.

77.    Only if the Bank Accounts are continued with the same account numbers can the transition into chapter 11 be smooth and orderly, with minimal interference with an orderly

liquidation.  A change in the Accounts to which customers wire and route payments could delay the Debtors' receipt of funds.  By preserving business continuity and avoiding operational and administrative paralysis that closing the existing Bank Accounts and opening new ones would necessarily create, all parties-in-interest will be best served and the benefit to the Debtors' estates will be considerable.  The confusion that would otherwise result could only work to the detriment of these chapter 11 cases.  Of course, no checks issued prior to the Petition Date are to be honored, except as otherwise provided by separate order of this Court.

78.    Because of their international operations, the Debtors' maintain both domestic and foreign bank accounts.  A list of the Debtors' Bank Accounts is set forth on Exhibit A attached to the Debtors' Debtors' Emergency Motion for Order Authorizing Continued Use of Existing Business Forms and Records and Authorizing Maintenance of Existing Corporate Bank Accounts and Cash Management System (the "Bank Account Motion").

79.    Domestic Accounts.  Arrow maintains two general operating accounts (the "General Operating Accounts") at Regions Financial Corporation ("Regions") into which customer payments are received and from which the majority of domestic expenses are paid.  Arrow also maintains a bank account at Regions that is used for deposits received through the International Air Transport Association ("IATA") clearinghouse and a bank account at Wachovia Bank ("Wachovia") into which customer payments received by credit card transactions[2] are deposited (collectively, the "Additional Deposit Accounts").  Funds in the Additional Deposit Accounts are swept by Arrow into the General Operating Accounts from time to time.  In addition to ordinary domestic operating expenses, Arrow also pays certain employee-related expenses through its General Operating Accounts.  More specifically, Arrow

---

[2] The account at Wachovia receives funds from all credit card transactions with the exception of payments made with the American Express card.  For customers using American Express, these payments are deposited directly into the General Operating Account at Regions.

uses the General Operating Accounts to pay (i) employee wages and salaries that are paid through direct deposit; and (ii) monthly health insurance premiums (including the employees' portion).

80.     Arrow also maintains a separate account that is used to fund (i) employee wages and salaries that are paid by check; (ii) service fees owed to Arrow's payroll service company, Automated Data Processing Inc. ("ADP"); and (iii) employee 401(k) contribution amounts (the "Payroll Account").  The Payroll Account is funded each week from the General Operating Accounts.  ADP, each week, withdraws the funds from the Payroll Account and (i) issues checks to the employees who are paid by check; (ii) pays itself for the monthly fees it is owed by the Debtors for ADP's services; and (iii) deposits the employee 401(k) contribution amounts into the applicable 401(k) accounts.  For foreign employees, the foreign station managers pay their foreign employees directly through the Foreign Accounts.

81.     In addition, Arrow maintains accounts at Wachovia (the "Backup Accounts") that serve as a backup to the General Operating Accounts and Payroll Account at Regions.  The Backup Accounts typically maintain a zero balance.

82.     Foreign Accounts.  In certain foreign jurisdictions, Arrow maintains local offices and representatives.  In those jurisdictions, Arrow has bank accounts into which it deposits payments from local customers and from which it pays local operating expenses (the "Foreign Accounts").  The Foreign Accounts are identified specifically in Exhibit A to the Bank Account Motion.  The amounts held in the Foreign Accounts are generally less than $200,000.00 in the aggregate, and Arrow only maintains amounts in the Foreign Accounts that are necessary to cover such local operating expenses.  These operating expenses include amounts paid for lease or office expenses, local cargo handlers and fuel providers, and commissions paid to local sales

agents.  To the extent that the funds in a particular Foreign Account exceed what is necessary to pay for the operating expenses, then such excess amount is swept from the Foreign Account and deposited into the General Operating Accounts.  Conversely, to the extent that funds in a particular Foreign Account are insufficient to meet the operating expenses, then Arrow transfers the amount needed from the General Operating Accounts to the particular Foreign Account.

83.     The Debtors request authority to continue to maintain their Bank Accounts and their Cash Management System.  The Debtors will continue to maintain records respecting all transfers between and among the Bank Accounts so that all transactions can be ascertained after they have occurred.  In addition, the Debtors will instruct their banks to add the designation, "Debtor-in-Possession" or "DIP" to their current and any future Accounts with each such bank, will treat the Accounts for all purposes as Accounts of the Debtors as DIPs, and will maintain records that recognize the distinction between prepetition and postpetition transfers.

84.     <u>Bank Fees</u>.  Arrow incurs certain nominal monthly fees with respect to the Bank Accounts.  These amounts are automatically debited by the particular banking institution at the beginning of each month.  The average aggregate amount of fees incurred for the Bank Accounts is $7,500.00.  The Debtors request authority to continue paying these monthly fees in the ordinary course of business, including any portion of the fees attributable to prepetition services, to avoid any disruption of the Cash Management System during the early critical stages of the Debtors' chapter 11 bankruptcy cases.

## C.     Expense Reimbursement

85.     The Debtors allow Employees to request reimbursement for work-related expenses which they have paid with their personal credit cards or with cash.  Employees also receive a per diem allowance for qualified business travel.  The Debtors seek authority to

reimburse all employees for prepetition expenses incurred on behalf of the Debtors. The Debtors estimate that less than $20,000.00 is currently owed to employees for qualified expense reimbursements.

**D.    Motion to Approve 1110 Stipulation**

86.    The Debtors have filed a motion to approve a stipulation under 11 U.S.C. § 1110(b) with Wells Fargo Bank Northwest, N.A. ("Wells Fargo") to extend the 60-day period provided in 11 U.S.C. § 1110(a)(2) with respect to the three Boeing 757-200 aircraft and corresponding engines (collectively, the "Aircraft Equipment") leased by Arrow under the 757 Leases. The 757-200 aircraft are listed on the Debtors' airline operating certificate. The Debtors require the aircraft equipment for a relatively short period postpetition in order to determine the appropriate disposition of the aircraft equipment. The stipulation would allow the Debtors to continue using the Aircraft Equipment by extending the 60-day period, for all purposes, until (a) October 31, 2010; (b) the date on which the stipulation is terminated in accordance with paragraph 10 thereof, if earlier than October 31, 2010; or (c) such later date as the Debtor and the Lessor may agree in writing.

87.    Without the relief requested in this motion, it is my understanding Wells Fargo would have the right to exercise possessory remedies after expiration of the 60-day period, which could result in the loss of the Debtors' airline operating certificate. Loss of the operating certificate, in turn, could negatively impact the Debtors' ability to sell their business to a third party, thus affecting the value of the Debtors' bankruptcy estates. The extension contemplated in the stipulation is not predicated on the payment by the Debtors of any amounts due under the 757 Leases or any other fee or charge. Additionally, the stipulation provides that, on termination

thereof, the 757 Leases shall be deemed rejected as of the Petition Date.  Approval of the stipulation is in the best interests of the Debtors and their bankruptcy estates.

### E.    Rejection of Certain Aircraft Engine Leases

88.    Because the Debtors have ceased operations, the Debtors no longer require the use of certain aircraft engines that are subject to leases identified in Exhibit A to Debtors' Emergency Motion Under Bankruptcy Code Section 365 for Authority to Reject Certain Aircraft Engine Leases.  Therefore, each of the identified leases is a burden to the Debtors, and the continuation of the leases would not be beneficial to the bankruptcy estates.  Continuation of the leases could give rise to substantial administrative expense claims that would negatively impact the bankruptcy estates and their creditors.  Rejection of the leases will minimize the Debtors' potential postpetition obligations, is in the best interests of the Debtors' estates, and represents a proper exercise of the Debtors' sound business judgments.

89.    In order to minimize the financial burden on the estate imposed by the aircraft engines identified, and due to the urgent nature of these proceedings, the Debtors request that the relief requested take effect immediately on entry of an order granting the relief requested.

### F.    Rejection of Certain Executory Contracts and Unexpired Leases

90.    Because the Debtors have ceased operations, the Debtors no longer require certain executory contracts and unexpired that are subject to leases identified in Exhibit A to Debtors' Emergency Motion under Bankruptcy Code Section 365 for Authority to Reject Certain Executory Contracts and Unexpired Leases.  The Debtors have determined that the contracts and leases identified are burdensome and will not benefit their estates.  Rejection of the contracts and leases will minimize the Debtors' potential postpetition obligations, is in the best interests of the Debtors' estates, and represents a proper exercise of the Debtors' sound business judgment.

FURTHER AFFIANT SAYETH NAUGHT.

Signed this 30 day of June, 2010.

_____
Doug Yakola

SUBSCRIBED and SWORN to before me, the undersigned authority, on this 30 day of June, 2010.

_____
Notary Public in and for the State of Florida

MARIANNE BENITEZ RUIZ
Notary Public - State of Florida
My Commission Expires Aug 1, 2011
Commission # DD 701133
Bonded Through National Notary Assn.